IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TONYA KILLEBREW, | CASE NO. 1:16CV1120 |
| Plaintiff, | |
| v. | |
| | MAGISTRATE JUDGE |
| | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | |
| SECURITY ADMINISTRATION, | |
| | **MEMORANDUM OPINION & ORDER** |
| Defendant. | |

Plaintiff Tonya Killebrew ("Killebrew") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 13.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Killebrew protectively filed an application for SSI on February 28, 2013, alleging a disability onset date of April 4, 1992.[1]  Tr. 13, 176, 197.  She alleged disability based on the following: bipolar disorder, post-traumatic stress disorder ("PTSD"), and depression.  Tr. 201.  After denials by the state agency initially (Tr. 90) and on reconsideration (Tr. 123), Killebrew requested an administrative hearing.  Tr. 54.  A hearing was held before Administrative Law

---

[1]  Killebrew also filed an application for Child's Insurance Benefits, which was denied.  Tr. 13, 24.  She does not appeal that decision.  Doc. 15, p. 1.  The ALJ explained that the time period encompassing her claim for childhood disability benefits ran from 1998 to 2003, and her SSI claim began to run on February 28, 2013, her application date.  Tr. 19.

Judge ("ALJ") Peter Beekman on January 6, 2015.  Tr. 30-53.  In his March 23, 2015, decision (Tr. 13-25), the ALJ determined that there were jobs in the national economy that Killebrew could perform, i.e., she was not disabled.  Tr. 23.  Killebrew requested review of the ALJ's decision by the Appeals Council (Tr. 7) and, on March 31, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Killebrew was born in 1980 and was 32 years old on the date her application was filed.  Tr. 176.  She has a GED and had attended some college.  Tr. 33.  She has no past relevant work.  Tr. 48.

### B. Relevant Medical Evidence[2]

On May 25, 2010, Killebrew underwent an initial psychiatric evaluation while incarcerated at the Cuyahoga County Corrections Center.  Tr. 378.  She stated that she had been raped the previous month, had had nightmares since then, and was unable to sleep.  Tr. 378.  She also reported manic episodes and stated that she believed she was bipolar.  Tr. 378.  Upon exam, she was awake, alert, oriented in all spheres, calm and cooperative, had good eye contact, had good insight and judgment, and denied suicidal/homicidal ideation and hallucinations.  Tr. 378.  She was diagnosed with PTSD; mood disorder, NOS; and polysubstance dependence (she admitted using tobacco, THC, ecstasy, cocaine and alcohol).  Tr. 378.  She was prescribed Prozac, Buspar, and Trazadone.  Tr. 378.

On June 21, 2010, Killebrew discontinued taking her Trazadone because she complained that it was administered too early—4:00 p.m.—causing her to fall asleep from that time until

---

[2] Killebrew challenges the ALJ's decision with respect to her mental impairments and the opinion evidence as it relates to her physical impairments.  As explained below, she did not receive treatment for her back impairment; accordingly, the medical evidence described herein relates to Killebrew's alleged mental impairments.

about 12:00 a.m., at which time she woke up.  Tr. 351, 352.  This caused her to be more irritable and to get angry more easily.  Tr. 351.  Upon exam, she was awake, alert, oriented, calm, cooperative, had good eye contact, and denied psychotic symptoms.  Tr. 351.

On August 16, 2010, Killebrew reported returning to prison on August 10, 2010.  Tr. 333.  She stated that she was "okay" and advised that, accordingly, she no longer wanted to take any medication.  Tr. 333.  She still had nightmares.  Tr. 333.  Upon examination, she was alert and oriented, calm and cooperative, denied psychotic symptoms, and displayed good insight and judgment.  Tr. 333.  Her medications were discontinued.  Tr. 333.

Killebrew was released from prison and then imprisoned again; on December 15, 2010, she was seen by the prison nurse.  Tr. 381, 326.  She had been off her medications for one week and last drank alcohol three days prior.  Tr. 381.  Upon exam, she exhibited appropriate speech and behavior, had a depressed mood, showed a logical and coherent thought process, and had no suicidal ideation or hallucinations.  Tr. 381.

 On January 8, 2011, Killebrew reported feeling very depressed and that she had not slept in more than two weeks.  Tr. 326.  Upon exam, she was awake, alert, oriented, calm, cooperative, had good eye contact, and denied suicidal ideation.  Tr. 326.  She was prescribed Prozac and Trazadone.  Tr. 326.  On February 6, 2011, she again stopped taking her Trazadone.  Tr. 325.

On December 14, 2012, Killebrew had been out of prison for two weeks and presented to Mental Health Services for Homeless Persons for a mental health assessment.  Tr. 511.  She reported that she spent her free time reading, going to Narcotics Anonymous meetings, and talking to her family.  Tr. 514.  She was taking lithium and Prozac.  Tr. 516.  She reported the following in a trauma assessment: the murder of her brother, her molestation as a child, and being the victim of rape in her teens and 30's.  Tr. 519.  She reported two prior suicide attempts,

at ages 15 and "20 something." Tr. 519. She was diagnosed with bipolar affective disorder by history, most recent episode depressed, and alcohol, cannabis and cocaine dependence in full sustained remission. Tr. 524. She was assessed a Global Assessment of Functioning ("GAF") score of 40 to 45.[3] Tr. 524.

On February 23, 2013, Killebrew reported that she had not been taking her medications for two months and that she needed lithium. Tr. 527. She reported sleeplessness for four days and then crashing, sadness and depression, and manic symptoms. Tr. 527. She had been in prison three times for committing four felonies. Tr. 527. Upon examination, she was oriented, her thought content was linear, goal-directed and optimistic, and her speech was normal. Tr. 528. She had a depressed mood, full affect, no suicidal ideation, fair concentration, concrete abstract thinking and no observed deficits in memory. Tr. 528. She was diagnosed with bipolar disorder, NOS, and polysubstance dependence in remission per Killebrew (stating that she had not used drugs or alcohol for 3 years). Tr. 527, 528. She was assessed a GAF score of 50 and prescribed lithium. Tr. 528.

On October 31, 2013, Killebrew visited Mental Health Services. Tr. 560. She reported that she felt manic, was not getting enough sleep, was "blowing off school" and missing appointments, and experienced sexual indiscretion and inappropriate spending. Tr. 560. She stated that, prior to her manic episode, she had been depressed for two weeks, could not get out of bed, and did not shower. Tr. 560. She had been off her medications. Tr. 560. She was diagnosed with bipolar disorder, NOS, PTSD, and polysubstance dependence in partial remission. Tr. 560. She was prescribed lithium for mood stabilization. Tr. 560.

---

[3] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

4

On December 5, 2013, Killebrew returned to Mental Health Services and reported feeling "aggravated as hell" and having stress, anxiety, and difficulty falling asleep. Tr. 559. Upon exam, she was calm and engaged, her speech was un-pressured, and her mood was congruent. Tr. 559.

On February 6, 2014, Killebrew saw Neil Goldenberg, M.D., at Mental Health Services, stating that she did not think her medications were working. Tr. 558. She reported that her mood had been down the past few months, she was sleeping a lot (up to 16 hours), isolating herself, and having suicidal thoughts. Tr. 558. She was a full-time college student living at a halfway house. Tr. 558. On examination, she exhibited normal speech, good eye contact, depressed mood, restricted affect, no internal stimuli, and had no present suicidal ideation. Tr. 558. Dr. Goldenberg restarted her on lithium, noting that it had been effective in the past. Tr. 558.

On June 18, 2014, Killebrew reported that she took her medications regularly but she was out of lithium and Prozac. Tr. 551, 555. She stated that her medications seemed to help. Tr. 551.

On July 10, 2014, Killebrew returned to Dr. Goldenberg stating, "I need meds"; she had been off her medications for a month. Tr. 557. She complained that lithium made her eye and neck twitch. Tr. 557. She described high anxiety from situational stressors: her mother was diagnosed with cancer, her landlord evicted her, and she wanted to break up with her fiancé. Tr. 557. She had difficulty falling asleep, a depressed mood, and racing thoughts. Tr. 557. Her alcohol intake had increased to 2 to 3 beers a day and she was smoking marijuana every other day. Tr. 557. Dr. Goldenberg assessed her with depression and anxiety in the context of multiple stressors, that she was sleep-deprived, and noted that she reported bad reactions to

Trazadone in the past.  Tr. 557.  He diagnosed PTSD, bipolar NOS, and alcohol and marijuana abuse.  Tr. 557.  He prescribed lithium, citalopram and Zolpidem for sleep.  Tr. 557.

On September 10, 2014, Killebrew saw Dr. Goldenberg reporting that she was going to have a nervous breakdown because her mother kicked her out of the house and she had moved up the street to an associate's house where the situation was very stressful (people drinking, arguing, creating drama, causing fighting between her and her boyfriend).  Tr. 556.  She stated that she beat her boyfriend up.  Tr. 556.  She stated that the Zolpidem did not work and that she had been out of her medications for one month.  Tr. 556.  Upon exam, she was irritable and her mood was "losing it."  Tr. 556.  Dr. Goldenberg assessed that she was stressed by her living situation and, combined with her medication withdrawal, had gotten physically violent with her boyfriend due to jealousy.  Tr. 556.  He restarted her medication for mood and agitation and discussed coping skills with her.  Tr. 556.

### C. Medical Opinion Evidence

#### 1. Treating source

On November 20, 2014, Dr. Goldenberg completed a mental residual functional capacity assessment on behalf of Killebrew.  Tr. 561-563.  He listed her diagnosis (PTSD, unspecified mood disorder, and alcohol and marijuana use disorder) and her medications (aripiprazole for mood stabilization, Citalopram for depression/PTSD, Clonazipam for anxiety, and Doxipin for sleep).  Tr. 561.  He opined that Killebrew's symptoms would interfere with her attention and concentration 20 to 25% of an eight-hour workday; that she would likely miss several days of work per month due to depression and anxiety; and that she would be unable to sustain an eight hour work day five days per week because she becomes overwhelmed and flooded with emotion easily, is highly irritable, and has a difficult time with interpersonal relations.  Tr.

6

561-562.  He assessed her as moderately to markedly limited in most work-related mental functions.  Tr. 562-563.

### 2. Consultative examiner

On May 15, 2013, Killebrew saw Hasan Assaf, M.D., for a physical consultative examination.  Tr. 530-538.  She reported having back pain for more than 10 years but had not seen a doctor for it and did not take pain medication.  Tr. 530.  She stated that the pain was worse with standing, walking and bending.  Tr. 530. She also reported not sleeping for periods of time, having taken medication in the past to help with her sleep, but that she currently had no access to medications.  Tr. 530.  She also complained of headaches for a long time but stated that she does not take any treatment for the pain.  Tr. 530.  At the time of her exam she was living in a halfway house and cooked five times per week, cleaned daily, did her laundry weekly, and showered and dressed daily.  Tr. 531.

Upon examination, Dr. Assaf observed that Killebrew had a normal gait, heel and toe walked without difficulty, squatted fully, had a normal stance, rose from a chair without difficulty, and could get on and off the examination table without assistance.  Tr. 532.  Her joints were stable and non-tender.  Tr. 532.  She had no sensory deficits, a full range of motion in her extremities except for her hips and knees, no abnormalities in her thoracic spine, and full motor strength.  Tr. 532-533, 535-538.  Her height was recorded at 5 feet 9 inches and her weight at 359 pounds.  Tr. 531.  Dr. Assaf diagnosed Killebrew with low back pain, "probably muscular in origin," headache consistent with migraines, and obesity.  Tr. 533.  He assessed that she had "moderate restrictions in activities involving standing, walking and bending."  Tr. 533.

### 3.  State agency reviewers

**Mental:** On April 11, 2013, state agency psychologist Paul Tangeman, Ph.D., reviewed Killebrew's records.  Tr. 85-87.  Regarding Killebrew's mental residual functional capacity ("RFC"), Dr. Tangeman opined that she could understand and follow simple and complex instructions, perform simple tasks that are repetitive and do not require strict production standards, interact on an occasional and superficial basis with others, and could perform static tasks.  Tr. 85-87.  On August 14, 2013, state agency psychologist Katherine Fernandez, Psy.D., reviewed Killebrew's record and adopted Dr. Tangeman's opinion.  Tr. 102-104.

**Physical:** On May 20, 2013, state agency reviewing physician Anne Prosperi, D.O., reviewed Killebrew's record, including her complaints of back pain and her morbid obesity.  Tr. 84.  Regarding Killebrew's physical RFC, Dr. Prosperi opined that she was capable of performing medium work with frequent or occasional postural activities.  Tr. 84-85.  On August 17, 2013, state agency physician Kourosh Golestany, M.D., reviewed Killebrew's record and adopted Dr. Prosperi's opinion.  Tr. 101-102.

### D. Testimonial Evidence

#### 1. Killebrew's Testimony

Killebrew was represented by counsel and testified at the administrative hearing.  Tr. 33-48.  She confirmed that she had been a full-time college student but had stopped attending school in the fall of 2014.  Tr. 33.  She believes that she stopped because her mood disorders hindered her; when she is manic she is "over the top, all over the place," cannot focus, and is very irritable.  Tr. 33-34.  It was "a task to get to school, and then try to ... keep up with the class and the professors."  Tr. 34.  As a result, she failed all but one class, in which she got a "C."  Tr. 34.  She attempted to go back for the spring semester but "it just didn't happen."  Tr. 34.

Killebrew listed the medications that she takes: lithium, Klonopin as-needed, Doxapram for sleep, and Celexa for depression. Tr. 35. She smokes about a pack of cigarettes a day and does not use alcohol regularly, although she had a couple of drinks for the recent Christmas and New Year holidays. Tr. 36. She stopped drinking in May 2013 after having what she felt like was a mental breakdown in April 2013 when she was drinking and smoking marijuana "really heavily." Tr. 36. She has not used marijuana since that time. Tr. 36. She stated that, contrary to a treatment note from September 2014 wherein she stated that she had been using both marijuana and alcohol at that time, she had not been using marijuana "in 2014 at all." Tr. 37.

When asked why she was unable to work, Killebrew explained that her attempts to work in the past had not been "really successful." Tr. 38. She had not been able to hold a job or interview well. Tr. 38. The previous jobs that she had were through temporary agencies or a friend or family member. Tr. 38. She has moods that cause her to not handle confrontation well and she also forgets a lot of things. Tr. 38. It is hard for her to be task-oriented. Tr. 38. She does not do well "in a subordinate situation"; "reprimands, criticism often trigger me into a defensive mode." Tr. 38. If she is manic, she does not sleep, so lack of sleep is not an issue for her during those times, but when she comes down off a manic episode and has not slept and has to handle something, she is not able to do so. Tr. 38. She gets dates, days and times mixed up, causing her to miss appointments, and she overeats, causing her weight issues. Tr. 38. She also has problems losing or gaining weight because she has been on medication for about four or five years and it has caused her thyroid to get "out of whack." Tr. 38. She has back issues and can only stand for about 15-20 minutes. Tr. 39, 40. Walking "hurts period," even small distances. Tr. 39. Currently, sitting at the hearing, her pain was 0 out of 10. Tr. 39. When she walks, it is about an 8-9/10. Tr. 39. She also has migraines that cause her to not be able to function "at all,

9

like I can't be around sound.  I can't be around light.  I can't be around silence." Tr. 39.  Everything hurts and is magnified.  Tr. 39.  Her migraines have subsided as the years have passed; currently, she experiences them about 2-3 times a week.  Tr. 40.  Sometimes they last all night, but, generally, they last an hour or two.  Tr. 42.

When asked how long she could stand in a day, Killebrew stated that she could stand for more than two hours a day, with breaks in between.  Tr. 41.  She does not believe that she could stand for more than four hours, because when she is in pain, she has to walk.  Tr. 41.  When she was not managing herself well, she would go on walks and end up on the other side of town; during her walks she would have to sit down and rest periodically because her back hurt.  Tr. 42.

Killebrew testified that her medication helps with her manic phases.  Tr. 43.  She still has them, but does not have them as often or for as long.  Tr. 43.  She has a manic phase at least twice a month.  Tr. 43.  She becomes very erratic and feels unstoppable and highly agitated.  Tr. 43.  She thinks she annoys people because they are always asking her if she is on her medications.  Tr. 43.  "I'm forever on the phone calling people, talking fastly, making impulsive decisions that most times get me in trouble."  Tr. 43.  She does not sleep at all when she has a manic phase.  Tr. 43.  If she does sleep, she sleeps for about three hours.  Tr. 43.  With her prescribed lithium, these phases last from two to five days.  Tr. 43.  During this time she is not able to keep appointments.  Tr. 44.  Her case manager will call her to facilitate a doctor's appointment but she does not know that she called because she does not check her messages until days later.  Tr. 44.  When her manic phase ends, she crashes and gets sad and depressed. Tr. 45.  She can't get out of bed and she feels sad, hopeless and shameful for some things she may have done.  Tr. 45.  These episodes last for about two weeks.  Tr. 45.  Her medication does not help her with her depressive episodes.  Tr. 45.

Killebrew stated, "I'm not really good with people." Tr. 45. She is always on guard and she does not handle criticism well; she gets defensive because she feels like a person is trying to start something with her or engage her. Tr. 45. She previously had difficulty working with a supervisor or a boss. Tr. 46. "People were stealing out of my drawer and my manage[r] was coming at me crazy. So I [physically] fought my manager." Tr. 46. She still gets into physical altercations but not as frequently. Tr. 46. She has a problem focusing on things; for example, when she was in college she would find herself reading the same page about four times. Tr. 47. It takes her days to complete household chores. Tr. 47-48.

### 2. Vocational Expert's Testimony

Vocational Expert Gene Burkammer ("VE") testified at the administrative hearing. Tr. 48-51. The ALJ asked the VE to determine whether a hypothetical individual of Killebrew's age and education could perform jobs in the national economy if the individual had the following characteristics: can lift and carry 50 pounds occasionally and 25 pounds frequently; can stand, walk and sit for six hours in an eight-hour workday; can frequently use a ramp or stairs and occasionally use ladders, ropes or scaffolds; can frequently stoop, kneel, crouch and crawl; must avoid high concentrations of smoke, fumes, dust and pollutants; can occasionally be around dangerous machinery and unprotected heights; can do simple, routine tasks that are low stress, i.e., no high-production quotas or piece rate work; must avoid work involving arbitration, confrontation, negotiation, supervision or commercial driving; can have only superficial interpersonal interactions with the public and coworkers; and can be around many people during the day, but the time spent with each one should be only occasional and of short duration (no more than five minutes). Tr. 48-49. The VE answered that such an individual could perform the following jobs at the medium level of exertion: laundry laborer (150,000 national jobs, 6,000

Ohio jobs, 500 local jobs); order puller (180,000 national jobs, 8,000 Ohio jobs, 700 local jobs); and, at the light level of exertion, housekeeping cleaner (500,000 national jobs, 30,000 Ohio jobs, 2,000 local jobs).  Tr. 50.

The ALJ asked the VE if his answer would change if the hypothetical individual could stand and walk four out of eight hours.  Tr. 50.  The VE stated that the medium jobs identified above would be excluded and that such an individual could perform the following, sedentary work: addresser (100,000 national jobs, 4,000 Ohio jobs, 400 local jobs); charge account clerk (100,000 national jobs, 4,000 Ohio jobs, 400 local jobs); and food and beverage order clerk (120,000 national jobs, 5,000 Ohio jobs, 500 local jobs).  Tr. 50-51.

Killebrew's attorney asked the VE whether his answer would change if the individual would have no interaction with the public.  Tr. 51.  The VE answered that such a restriction would exclude all sedentary jobs.  Tr. 51.  Killebrew's attorney asked the VE what his answer would be if the hypothetical individual would be off-task 20-25% of the workday, and the VE replied that such a limitation would preclude all work.  Tr. 51.  Killebrew's attorney asked if the VE's answer would change if she added to the ALJ's hypothetical a limitation that there would be no interaction with the public or coworkers.  Tr. 51.  The VE stated it would be difficult to find jobs for such an individual.  Tr. 51.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id*.

### IV. The ALJ's Decision

In his March 23, 2015, decision, the ALJ made the following findings:

1. Born on April 4, 1980, the claimant attained the age of 18 on April 3, 1998 and attained age 22 on April 3, 2002. Tr. 15.

2. The claimant has not engaged in substantial gainful activity since April 3, 1998, the date she attained the age of 18. Tr. 15.

3. The claimant has the following severe impairments: bipolar disorder, obesity, post-traumatic stress disorder (PTSD), asthma and polysubstance dependency disorder. Tr. 16.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 16.

5. The claimant has the residual functional capacity to perform a range of medium work as defined in 20 CFR 404.1567(a) and 416.967(c). More specifically, the claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently. The claimant can stand or walk for a total of approximately 6 hours in an 8-hour workday and sit 6 hours in an 8-hour workday. She can constantly push and pull, as well as operate foot pedals. She can frequently climb ramps or stairs, occasionally climb ladders, ropes or scaffolds and constantly balance. She can frequently stoop, kneel, crouch and crawl. She has no manipulative, visual or communication deficits. She should avoid high concentrations of smoke, fumes, dust and pollutants. She should only occasionally be around dangerous machinery and unprotected heights. She should be limited to simple, routine tasks. The tasks should be low-stress, meaning there should be no high rate production quotas, no piece rate work, no confrontation, no arbitration, no negotiation, no supervision and no commercial driving. She should only have superficial interpersonal interaction with the public and co-workers. She may spend time around many people during the day, but the time spent should be only occasionally, last no longer than 5 minutes and should be for a definite purpose. Tr. 18.

6. The claimant has no past relevant work. Tr. 23.

7. The claimant was born on April 4, 1980 and attained the age of 18 on April 3, 1998.  Tr. 23.

8. The claimant has at least a high school education and is able to communicate in English.  Tr. 23.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 23.

10. Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 23.

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 3, 1998, the date she attained the age of 18, through the date of this decision.  Tr. 24.

## V. Parties' Arguments

Killebrew objects to the ALJ's decision on one ground: substantial evidence does not support the ALJ's decision to give "little" weight to the opinions of her treating source, Dr. Goldenberg, and the consultative examiner, Dr. Assaf.  Doc. 15, pp. 10-15.  In response, the Commissioner submits that the ALJ properly considered the opinions of Drs. Goldenberg and Assaf and that his findings are supported by substantial evidence.  Doc. 19, pp. 7-13.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err when he assigned "little" weight to Dr. Goldenberg's opinion

Killebrew argues that the ALJ erred when he assigned "little" weight to the opinion of Dr. Goldenberg, her treating source.  Doc. 15, p. 10.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ considered Dr. Goldenberg's opinion dated November 20, 2014:

[Dr. Goldenberg] noted the claimant was diagnosed with PTSD, unspecified mood disorder, alcohol and marijuana use disorder and asthma.  He further opined the claimant would be off-task for 20-25% of an eight-hour workday and that she would be unable to sustain an 8-hour workday, 5 days a week [] because she becomes overwhelmed and flooded with emotions easily, is highly irritable and has difficulty with interpersonal relationships.  He also noted the claimant would likely miss several days due to her depression and anxiety, but that since she had never held down a job, this was just an estimate.  Overall, he found the claimant had marked mental limitations in her capacity to sustain activity over a normal workday/workweek (Exhibit 9F).  I assign little weight to

16

> the opinion of Dr. Goldenberg as it is not supported by the medical evidence of record. More specifically, the claimant showed improvement with mental health treatment and medication. Additionally, Dr. Goldenberg noted that his opinion regarding the claimant's need to miss work was only an estimate and his opinion is not supported by the evidence of record.

Tr. 22-23.

Killebrew contends that the record does not demonstrate that her mental health improved with treatment, as the ALJ found. Doc. 15, p. 12. She argues that, earlier in his decision, the ALJ cited to two documents in the record—"Exhibit 8F" and "Exhibit 4F, p. 70"—in support of his statement that Killebrew's symptoms improve with medication and treatment, but that these records do not support his conclusion. Doc. 15, pp. 12-13 (citing Tr. 21). As an initial matter, the Court notes that "Exhibit 8F" contains treatment notes from Mental Health Services and Dr. Goldenberg, which, as detailed below, support the ALJ's decision. And Killebrew ignores the previous page in the ALJ's decision, with citations to the record, wherein he details her treatment history beginning in January 2011 and ending in September 2014, just prior to Dr. Goldenberg's decision. Tr. 20. He observes that this evidence shows that, twice, Killebrew herself reported that her medications helped her; that she did not always take her medications; and that she had, throughout this time, only presented intermittently for treatment. Tr. 20. The ALJ also explained that, prior to 2011, Killebrew refused mental health treatment while incarcerated and routinely failed to take her medication. Tr. 21. Indeed, all but one of Killebrew's visits to Dr. Goldenberg show her having been off her medication for some time. *See, e.g.*, Tr. 560 (October 2013, out of medication "for awhile"); "Tr. 558 (February 2014, out of medication for one month); Tr. 551 (June 2014, out of medication); Tr. 557 (July 2014, out of medication for one month); Tr. 556 (September 2014, out of medication for one month). The ALJ commented that Dr. Goldenberg remarked in September 2014 that Killebrew's symptoms (increased irritability

and insomnia and her beating up her boyfriend) were caused by her stressors (chaotic living situation) and her "med withdrawal"; even Dr. Goldenberg opined that Killebrew's physical violence was caused, in part, by her not having taken her medication. Tr. 20, 556. Finally, the ALJ noted that Killebrew reported, in June 2014 when she ran out of her medication, that she had had no major treatment episodes since her prior appointment months before. Tr. 20. In other words, the record supports the ALJ's conclusion that Dr. Goldenberg's opinion be given little weight because it is unsupported by the record, i.e., Killebrew improved with treatment and medication. Dr. Goldenberg principally saw Killebrew when she had been off her medication; he opined that Killebrew's symptoms were exacerbated when off medication; and Killebrew herself, repeatedly, reported that her medication improved her symptoms. This is substantial evidence that supports the ALJ's decision and his decision, therefore, must be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (A court "defer[s] to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'").

### B. The ALJ did not err when he assigned "little" weight to Dr. Assaf's opinion

Killebrew argues that the ALJ erred when he gave "little" weight to the opinion of Dr. Assaf, the consultative examiner who assessed Killebrew's physical functioning. Doc. 15, p. 14. She concedes that the ALJ's reasons for giving little weight to Dr. Assaf's opinion—the record showed normal examination findings, lack of objective evidence of a back impairment, and lack of medication for back pain—are "correct," but submits that ALJ "ignores the fact that Dr. Assaf gave multiple diagnoses and may have based his limitations upon Ms. Killebrew's obesity." Doc. 15, pp. 14-15. She then goes on to identify a treatment note in the record wherein

Killebrew's BMI was calculated.  Doc. 15, p. 15.  She concludes, "Given Ms. Killebrew's level of obesity, Dr. Assaf reasonably limited [her] standing, walking and bending capabilities."  Doc. 15, p. 15.

The ALJ did not err when he did not consider that Dr. Assaf "*may have* based his limitations" on Killebrew's obesity.  Killebrew cites no legal authority stating that an ALJ must consider possible, unmentioned reasons why a consultative examiner assessed certain limitations.  The ALJ considered Killebrew's obesity and the effect it had on her alleged back pain (Tr. 21); Killebrew does not object to this portion of the ALJ's decision.  Her argument that the ALJ erred when he considered Dr. Assaf's opinion is without merit.

## VII. Conclusion

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.

Dated: February 21, 2017

Kathleen B. Burke
United States Magistrate Judge